STATE of Wisconsin, Plaintiff-Respondent,

v.

Theodore OSWALD, Defendant-Appellant.†

Court of Appeals

*No. 97–1026–CR. Oral argument September 16, 1999.—Decided December 8, 1999.*

## 2000 WI App 2

(Also reported in 606 N.W.2d 207.)

†Petition to review denied.

64

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Jerome F. Buting* and *Kathleen B. Stilling* of *Buting & Williams, S.C.* of Brookfield. There was oral argument by *Jerome F. Buting.*

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Paul Lundsten*, assistant attorney general and *James E. Doyle,* attorney general. There was oral argument by *Paul Lundsten.*

Before Brown, P.J., Nettesheim and Anderson, JJ.

¶ 1.   ANDERSON, J.   Theodore Oswald appeals from a nineteen-count judgment of conviction and an order denying his motion for postconviction relief. A new trial is warranted, he argues, because of juror bias, juror misconduct and ineffective assistance of trial counsel. First, he contends that the circuit court erroneously denied his motions to remove three jurors for cause, forcing him to use his peremptory strikes to remove them. Because he used his peremptory strikes to correct a court error, he requests a new trial where he would receive his full statutory entitlement of peremptory strikes.

¶ 2.   Additionally, Oswald insists that during voir dire prospective jurors discussed their opinions about his guilt and the case while in the waiting room. Claiming that the court erroneously exercised its discretion by failing to properly investigate the misconduct allegations, he requests a new trial.

¶ 3.   Lastly, Oswald contends that he was denied effective assistance of counsel because his trial counsel: (1) erroneously conducted voir dire, (2) failed to request a change of venue, and (3) failed to properly investigate and pursue a mental disease or defect defense. We reject these arguments and affirm.

¶ 4.   A detailed discussion of Oswald's criminal activities is not necessary for this appeal. Suffice it to say, Oswald's conviction flows from the armed robbery of three financial institutions, a kidnapping and a run-

ning gun battle with law enforcement after the third robbery.[1] During the chase and gun battle, a police captain was killed, and a hostage and three police officers were wounded. Oswald participated in the crimes with his father, James Oswald. The Oswald crime spree generated extensive coverage from the print and electronic media. Understandably, the pretrial publicity permeated the jury selection process, requiring the circuit court to call a large panel, to use written questionnaires for screening the panel of prospective jurors and to conduct individual voir dire.

¶ 5.    After a three-week jury trial, Oswald was found guilty on all counts and sentenced.[2] He then

---

[1] For a more thorough factual discussion, *see State v. James Oswald*, 2000 WI App 3, ¶ 2, 232 Wis. 2d 103, 606 N.W.2d 238.

[2] Oswald was convicted of three counts of party to the crime of aiding and abetting an armed robbery while concealing identity, *see* §§ 939.05(2)(b), 943.32(2) and 939.641, STATS.; one count of party to a conspiracy to commit first-degree intentional homicide by using a bulletproof vest and a dangerous weapon plus one count of an attempt of the same crime, *see* §§ 939.05(2)(c), 940.01(1), 939.63(1)(a), 939.64(2) and 939.32(1)(a), STATS.; one count of party to the crime of aiding and abetting the armed taking of a vehicle without consent, using a bulletproof vest, *see* §§ 939.05(2)(b), 943.23(1g) and 939.64(2), STATS.; one count of party to the crime of aiding and abetting armed burglary using a bulletproof vest, *see* §§ 939.05(2)(b), 943.10(2)(a) and 939.64(2), STATS.; one count of party to the crime of aiding and abetting the armed taking of hostages by force or threat using a bulletproof vest, *see* §§ 939.05(2)(b), 940.305, 939.63(1)(a)2 and 939.64(2), STATS.; one count of party to the crime of aiding and abetting the armed operation of a motor vehicle without consent, using a bulletproof vest, *see* §§ 939.05(2)(b), 943.23(3), 939.63(1)(a) and 939.64(2), STATS.; eight counts of party to the crime of aiding and abetting attempted first-degree intentional homicide using a bulletproof

moved the court for a new trial. He argued that a new trial was warranted because of juror bias and misconduct and the ineffectiveness of his trial counsel. His postconviction motion was denied. Oswald reasserts these arguments on appeal.

## JUROR BIAS

### BACKGROUND

¶ 6. A few weeks before trial, the court heard arguments regarding jury selection. The court determined that three alternate jurors would be impaneled, resulting in a fifteen-member jury panel selected from a twenty-nine person jury pool. Because alternate jurors would be seated, each party was granted an additional peremptory strike or seven total strikes. Oswald's motions to use juror questionnaires and to conduct individual voir dire of the jurors were both granted.

¶ 7. Voir dire took place over four days. During the course of voir dire, Oswald moved the court to strike twenty-seven jurors for cause. The court granted all but six of Oswald's requests to strike. On appeal, Oswald argues that the trial court erred by not striking three of these jurors for cause, and, because of this, he should be given a new trial. He contends that each of these jurors had exhibited bias by his or her strong and

---

vest and a dangerous weapon, *see* §§ 939.05(2)(b), 939.32(1)(a), 940.01(1), 939.63(1)(a)2 and 939.64(2); and one count of party to the crime of aiding and abetting first-degree recklessly endangering safety using a bulletproof vest and a dangerous weapon, *see* §§ 939.05(2)(b), 941.30(1), 939.63(1)(a)2 and 939.64(2), STATS. He was sentenced to serve 565 years in prison consecutive to two life sentences (in addition to ten years to be served concurrently).

firmly held opinion that he was guilty of the charged crimes. In addition, he argues that because the court failed to dismiss these jurors for cause, he was forced to use his peremptory challenges to remove them and, as a result, was deprived of the full number of peremptory challenges.

¶ 8.   We begin by noting that this case was not typical, as was highlighted by the court's willingness to adopt special jury selection procedures. This case was unique not only because of the enormous media coverage of the charged criminal activities, but also because of defense counsel's plan to turn the media coverage into a positive factor for his client. Because the media had consistently portrayed Oswald as an impressionable teenager who was victimized by his abusive and manipulating father, defense counsel desired jurors who had heard or read such media reports. Defense counsel reasoned that a juror with such knowledge would likely support the planned defense strategy—coercion. Oswald's strategy was not to contest his physical participation in the crimes but, instead, to focus on the theory that he participated in the crimes because he was coerced to do so by his father. Counsel believed that the media reports contained information that might not be admissible at trial. As an important circumstance of this case, we will bear in mind Oswald's theory of defense while reviewing the record for jury selection.

### THE JURORS

¶ 9.   Oswald objects that the first juror questioned during voir dire, Jan G., should have been dismissed for cause. During preliminary questioning by the circuit court, Jan G. stated that based on pretrial publicity and his own personal morals, he had

reached the opinion that Oswald was guilty. During continued questioning, Jan G. said that "it would probably be very difficult" to put aside what he had learned about the case and reach a verdict on the evidence presented in the courtroom.

¶ 10. When quizzed by the prosecutor about whether he could put aside what he had heard and read, Jan G. responded, "I would hope that I'd have an open mind enough to be able to do that. . . . I'd try." He later agreed that he would try to decide the case solely on the evidence he heard during the trial. However, in response to questions from defense counsel, Jan G. admitted it would be very difficult for him to keep an open mind. He admitted during further questioning that he believed he should not be a juror because he felt so strongly about Oswald's guilt.[3] The circuit court failed to ask any follow-up questions. Oswald's counsel moved to strike him for cause. After hearing arguments from both counsel regarding the motion to strike, the court denied the motion. It concluded that although Jan G.'s answers gave mixed messages, he clearly responded that he would be able to follow the court's instructions.

¶ 11. Next, Oswald objects that Edward T. should have been dismissed for cause. Edward T. revealed in his juror questionnaire that he had seen the video tape of Oswald's gun battle and capture on television at least ten times. The court questioned Edward T. about what he specifically remembered from the video tape. He replied, "It's obvious that [Oswald] was in the van and was taking part in the—in both the shooting,

---

[3] Jan G. had completed a written juror questionnaire prior to voir dire. Responding to a question about his opinion of Oswald's guilt, he commented, "Yes, guilty. No doubt in my mind that he was involved with his father."

robbery, kidnapping and whatnot, so I would say that my opinion would be that he would be guilty." Nevertheless, when informed by the prosecutor that the video tape would be shown during the trial, Edward T. agreed that viewing the video tape as evidence would make it easier for him to follow the judge's instructions to consider only the evidence admitted at trial. However, when asked by defense counsel if his opinion about Oswald's guilt was based on both the video tape and the printed media reports, Edward T. replied "yes" and that he would not be able to put those opinions aside. In a follow-up question by the prosecutor, Edward T. again stated that if the evidence included the video tape he would be able to set aside his opinions.[4] The circuit court did not pursue any follow-up questioning of Edward T. In denying Oswald's challenge for cause, the court stated that Edward T. was nervous and there were "inconsistent answers to questions." The court reasoned that "he was trying to answer the questions presented to him as forthrightly and as completely as possible."

¶ 12.   The final juror that Oswald argues should have been stricken for cause was Marcia W. Marcia W. told the court that Oswald's taking a housewife hostage traumatized her, and, as a result, she "might not be able to be really fair." She admitted that she did consider Oswald guilty based upon a video tape of the incident that she had seen on television. Although she agreed that she would try to put what she knew out of her mind, she remarked that she was not sure if she could totally block it out. Defense counsel asked a series of questions relative to Marcia W.'s openness to

---

[4] In his questionnaire, Edward T. wrote that he believed Oswald to be guilty "because of collection of guns and premeditation of robberies and escape at all cost."

71

the presentation of a coercion defense. In her responses, she revealed that the previous night she had received a phone call from her church's prayer chain and was told that she should not only pray for Oswald, but "for those people who would sit in judgment." She stated that she "felt a lot of pressure."

¶ 13.   When further questioned about her opinion of the coercion defense, Marcia W. replied that after the phone call she was up all night and that she believed, "[Y]ou have a choice and that there—I'm sure that every time anybody takes an action many things build into that and cause you to do different things and I'm not saying that isn't valid. I still feel that's not an excuse for a—I think we all know right from wrong." When asked directly if she could follow the court's instructions on a coercion defense, Marcia W. replied that she would try but was not sure if she could. After being instructed on the coercion defense by the court, Marcia W. stated, "I guess I probably have a problem with that part of the law, umm, my conservative mind but I would try."[5]

¶ 14.   Defense counsel moved to strike Marcia W. on the grounds that she was traumatized from the incident because she identified with the hostage and she was not sure she could follow instructions on the coercion defense. The circuit court denied the motion, holding that Marcia W.'s trauma from hearing about the incident was not unusual and there was no evidence that "she was in any way reactive . . . to Theodore Oswald." The court failed to address the portion of counsel's motion challenging Marcia W.'s ability to follow the coercion instructions.

---

[5] In her questionnaire, Marcia W. wrote that her reaction to the video tape of the gun battle and subsequent apprehension of Oswald was "[g]uilt, disgust and fear."

¶ 15.  Because the court did not grant Oswald's motions to remove these three jurors for cause, Oswald used three of his seven peremptory strikes to remove them from the jury pool. He insists that the court erroneously exercised its discretion by failing to remove the jurors. This failure is grounds for reversal, he contends, because it forced him to use peremptory strikes to remove jurors who should have been stricken for cause, thus depriving him of his full statutory entitlement of peremptory challenges.

## DISCUSSION

¶ 16.  The United States and Wisconsin Constitutions guarantee a criminal defendant the right to a trial by an impartial jury. *See* U.S. CONST. amend. VI; WIS. CONST. art. I, § 7. A juror who "has expressed or formed any opinion, or is aware of any bias or prejudice in the case" should be removed from the panel. *See* § 805.08(1), STATS. Additionally, "[i]f a juror is not indifferent in the case, the juror shall be excused." *Id.*

¶ 17.  Courts should strive to avoid even the appearance of bias. *See State v. Louis*, 156 Wis. 2d 470, 478, 457 N.W.2d 484, 488 (1990). In *State v. Faucher*, 227 Wis. 2d 700, 716, 596 N.W.2d 770, 777 (1999), our supreme court clarified the terminology to be used when examining juror bias. We will determine a prospective juror is biased and therefore should be removed for cause if the prospective juror is (1) statutorily biased, (2) subjectively biased or (3) objectively biased. *See id.*

## A.  Statutory Bias

¶ 18.  A prospective juror is statutorily biased if the prospective juror falls into one of the groups the legislature has deemed are biased as a matter of law in § 805.08(1), STATS. *See Faucher*, 227 Wis. 2d at 717, 596 N.W.2d at 778. Prospective jurors are statutorily biased if they are related by "blood or marriage to any party or to any attorney appearing in the case" or if they "[have] any financial interest in the case." *See* § 805.08(1). "Statutory bias is a conclusion of law premised on the belief that certain relationships are so inherently prone to partiality that an individual case-by-case inquiry is not worth the time or effort." *State v. Kiernan*, 227 Wis. 2d 736, 744, 596 N.W.2d 760, 764 (1999). Neither party suggests that any juror should have been removed for statutory bias because he or she fell into one of the § 805.08(1) categories of excluded persons. Accordingly, we will only discuss the subjective and objective prongs for juror bias.

## B.  Subjective Bias

¶ 19.  A prospective juror is subjectively biased if the record reflects that the juror is not a reasonable person who is sincerely willing to set aside any opinion or prior knowledge that the prospective juror might have. *See Kiernan*, 227 Wis. 2d at 745, 596 N.W.2d at 764. "[S]ubjective bias refers to the bias that is revealed by the prospective juror on voir dire: it refers to the prospective juror's state of mind." *Faucher*, 227 Wis. 2d at 717, 596 N.W.2d at 778. Most frequently, a prospective juror will not explicitly admit to a prejudice or inability to set aside this prejudice. Through the juror's verbal responses to voir dire questions and his or her

demeanor, the court can assess if the juror is subjectively biased. *See Kiernan,* 227 Wis. 2d at 745, 596 N.W.2d at 764. The court's determination of whether a juror is subjectively biased is a factual finding and will be upheld unless clearly erroneous. *See id.* We will now review the court's determination that none of the prospective jurors in question were subjectively biased.

¶ 20.   Jan G. repeatedly expressed doubts about his ability to ignore his opinions formed from pretrial publicity and his personal morals, but he also repeatedly affirmed his willingness to attempt to put aside his opinions and judge the case based on the evidence presented. He candidly confessed that he felt he was not the best choice for a juror because of his beliefs. The court considered the prosecutor's argument that every juror in the jury pool would have some feelings toward Oswald based on the media coverage but that this alone should not disqualify a juror. Rather, the prosecutor pointed out that a juror should only be disqualified if he or she were unable to set this opinion aside.

■

¶ 21.   The circuit court determined that Jan G. was not subjectively biased. It believed that "he, clearly, responded that he would try to follow whatever the court's instructions are and, essentially, be fair and impartial . . . ." The record supports the court's finding that Jan G. was a reasonable person and that he was sincere in his willingness to set aside his opinion. "[A] prospective juror need not respond to voir dire questions with unequivocal declarations of impartiality." *State v. Erickson,* 227 Wis. 2d 758, 776, 596 N.W.2d 749, 759 (1999), *cert. denied,* 120 S.Ct. 987 (2000). The court's conclusion that Jan G. was not subjectively biased is not clearly erroneous.

¶ 22.  Edward T. gave conflicting answers when questioned about whether he would be able to put his opinions aside. He first stated "no," rationalizing that because he had seen multiple airings of the video tape depicting some of the alleged criminal activities, he was convinced of Oswald's guilt. However, after being informed that the video tape would most likely be shown to the jury and could be considered as evidence, he felt he could put his opinions aside. The court believed that Edward T. gave conflicting answers because he was trying very hard to be forthright and was nervous. Such a determination relies on the juror's demeanor while being questioned. Whether a juror is subjectively biased will frequently "only be revealed through his or her demeanor." *See Faucher*, 227 Wis. 2d at 718, 596 N.W.2d at 778. The court correctly relied on Edward T.'s demeanor to judge if he was subjectively biased. "[T]he circuit court sits in a superior position to assess the demeanor and disposition of prospective jurors." *Id.* Accordingly, we agree with the court's finding that Edward T. was not subjectively biased.

¶ 23.  Marcia W. also expressed concerns about her ability to be fair, particularly regarding a coercion defense. She also confessed to personally having traumatic feelings from news reports that Oswald allegedly took a housewife hostage. However, she repeatedly stated that she would try to put her opinions aside and follow the court's instructions.

¶ 24.  The court found no subjective bias. It reasoned that Marcia W.'s feelings of trauma were nothing unusual and were in fact feelings of putting herself in the same position as the hostage, which was exactly what a juror would be asked to do during the trial.

Indeed, a court is expected to "use voir dire to explore a prospective juror's fears, biases, and predilections and fully expect a juror's honest answers at times to be less than unequivocal." *Erickson*, 227 Wis. 2d at 776, 596 N.W.2d at 759. The court accepted Marcia W.'s affirmations that she would try to set aside her opinions. We find that the court's determination was not clearly erroneous. None of the jurors in question should have been dismissed for cause on grounds of subjective bias.

## C. *Objective Bias*

█

¶ 25.   A prospective juror is objectively biased if "a reasonable person in the prospective juror's position objectively could not judge the case in a fair and impartial manner." *Id.* at 775, 596 N.W.2d at 759. When determining if a juror is objectively biased, the circuit court should consider the facts involved in the case and the facts and circumstances surrounding the voir dire. *See Faucher*, 227 Wis. 2d at 718, 596 N.W.2d at 779. For example, when there is evidence from voir dire that a prospective juror has formed an opinion or has prior knowledge, a court must ask if a reasonable person in the juror's position could set aside the opinion or prior knowledge. *See id.* at 719, 596 N.W.2d at 779. A court's conclusion on whether a prospective juror is objectively biased is a mixed question of law and fact. *See id.* at 720, 596 N.W.2d at 779. We will give weight to this conclusion during our review and will reverse it only if a reasonable judge could not have reached it as a matter of law. *See id.* at 721, 596 N.W.2d at 779–80.

¶ 26.   Courts have found objective bias or that a reasonable person in the prospective juror's position would not be able to be impartial if, for example, a prospective juror is related to a state's witness by blood

or marriage to the third degree or if the prospective juror has a recent and continuous contact with the criminal justice system. *See State v. Gesch*, 167 Wis. 2d 660, 671, 482 N.W.2d 99, 104 (1992); *State v. Mendoza*, 227 Wis. 2d 838, 854, 596 N.W.2d 736, 744 (1999). On the other hand, if a veteran juror was impaneled on a similar type of case, he or she will not be considered impartial per se but must exhibit bias about the specific case or issues he or she is called to hear. *See Kiernan*, 227 Wis. 2d at 749, 596 N.W.2d at 766. The prospective juror must demonstrate an ingrained attitude about the particular subject of the case. *See Mendoza*, 227 Wis. 2d at 850 n.6, 596 N.W.2d at 742. There must be a connection between the prospective juror's bias and the issues or theory of the case. These attitudes or opinions must be strongly held, *see Faucher*, 227 Wis. 2d at 735, 596 N.W.2d at 786, but are not expected to be unequivocal, *see Kiernan*, 227 Wis. 2d at 750 n.10, 596 N.W.2d at 767.

¶ 27. From an objective viewpoint, the criminal activities in this case were widely publicized. Yet, we do not expect that prospective jurors will not have formed opinions from such media exposure; our concern is if a reasonable person in the prospective juror's position would have the ability to put aside these opinions and consider the case based on the evidence presented at trial.[6]

---

[6] In *State v. Herrington*, 41 Wis. 2d 757, 765, 165 N.W.2d 120, 123–24 (1969) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722–23 (1961)), the supreme court stated:

It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This

¶ 28.  In this case, the circuit court did not have the benefit of the recent supreme court cases and therefore did not address whether the prospective jurors were objectively biased. We will independently examine the record to determine whether it supports a determination that they were not objectively biased. We are mindful that we are admonished to consider the facts and circumstances of voir dire along with the facts involved in the case. *See Faucher*, 227 Wis. 2d at 718, 596 N.W.2d at 779. As we consider this point, we initially must disagree with Oswald's chief argument, supporting his contention that the prospective jurors were objectively biased and should have been dismissed for cause.

¶ 29.  In his brief, Oswald claims that all the prospective jurors expressed strong opinions that he was guilty. These opinions, he argues, go "straight to the heart of the issue: their ability to presume the defendant innocent unless proven guilty of the charges." However, the facts and circumstances of this case reveal that this statement is incorrect. For Oswald, the heart of the issue during voir dire was securing a jury amenable to his coercion defense strategy. As a part of this strategy, Oswald was opting not to contest his participation in the crimes. His tactical decision was not to protest his guilt. This strategy involved searching for a particular type of juror; this ideal juror would not presume that Oswald was innocent but would be influenced by the media coverage and also could be

---

is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

supportive of a coercion defense. The particular type of juror that Oswald sought is an important circumstance surrounding the voir dire.

¶ 30.　Considering that the defense sought jurors amenable to its coercion defense, the State argues that a reasonable juror would have misconceptions about what such a defense means. It points out that the prospective jurors were asked about their receptivity to a coercion defense, but it was never fully explained to them. A reasonable juror, it contends, would have viewed this case primarily as a homicide and most of the questions on coercion seemed to imply that this was a complete defense to all the charges.

¶ 31.　We agree that this is a reasonable inference to draw from the voir dire. For instance, Marcia W. initially remarked that she probably could not consider a coercion defense because people make their own choices and cannot later seek to be excused from them. However, after the judge briefly summarized how a coercion defense would be applied in the case, she stated that she might still have a problem with such a coercion defense but she could try to consider it. A reasonable person would respond with reservations to questions about a legal defense that he or she did not completely understand and possibly assumed might relieve the defendant of guilt. Under the circumstances, Marcia W. replied in the manner that any reasonable person would. She affirmed her willingness to try to follow the court's instructions but confessed her trepidation. A reasonable person in Marcia W.'s position could set aside his or her prior opinions and judge the case impartially. We conclude that Marcia W. was not objectively biased.

¶ 32.　In addition to Marcia W., Oswald also argues that Jan G. and Edward T. were objectively

biased because of their strong opinions that he was guilty. First, we question the strength of these jurors' opinions. Both jurors equivocated in the answers and messages they gave the court. Second, we again note that the defense strategy employed at voir dire was not to secure a jury panel consisting of only jurors who stated they could presume Oswald innocent until proven guilty; rather, the defense sought jurors with some awareness of the media coverage and an amenability to a coercion defense.

¶ 33.   Recently, the *Faucher* court determined that a prospective juror was objectively biased because of the strength of his opinion about a case's crucial witness. *See Faucher*, 227 Wis. 2d at 733, 596 N.W.2d at 785. In reaching this conclusion, the court focused on the juror's "strongly held belief" about the case's crucial witness. *See id.* In contrast, the present situation differs because unlike the *Faucher* juror, the strength of the prospective jurors' opinions changed during the voir dire and, importantly, their opinions did not concern the central issue in the case.

¶ 34.   In the present case, both Jan G. and Edward T. equivocated in their responses regarding their abilities to put aside their opinions. When they changed their initial responses from not being able to set aside their guilty opinions to a sincere willingness to try to do so, they showed that these opinions were not ingrained attitudes. Furthermore, Oswald's primary concern during voir dire was to seat jurors who could potentially support his coercion defense strategy. Following this strategy, Oswald's defense sought jurors exposed to the media coverage about the crimes and his father's behavior and, yet, open to believing that Oswald was coerced to perform those acts. This defense theory was the crucial issue in this case and neither

Jan G.'s. nor Edward T.'s opinion that Oswald was guilty would prevent them from judging the defense's theory in a fair and impartial manner.

¶ 35.   Each prospective juror candidly confessed any preconceived opinions he or she held. The prospective jurors each waivered when questioned about the strength of these opinions—whether these prior opinions were so strong they could not be disregarded. Like any reasonable person who is unfamiliar with serving as a juror and what will be expected of him or her in that role, the prospective jurors informed the court that they had opinions that Oswald was guilty, but that they were willing and would try to follow the court's instructions to put these prior opinions aside and consider only the evidence presented at trial. Although each juror initially assured the court that his or her guilty opinions were firm, their responses to further questioning revealed that these prior opinions were not ingrained attitudes unchangeable by court instructions and the presentation of evidence.

¶ 36.   Considering the special facts and circumstances surrounding this voir dire, we conclude that a reasonable person in Jan G.'s or Edward T.'s position could set aside his or her prior opinions. The record shows that neither Jan G. nor Edward T. was objectively biased.

¶ 37.   In sum, we determine that the prospective jurors should not have been dismissed for cause. The court did not err when it denied Oswald's motions to strike these jurors because the prospective jurors were not statutorily, subjectively or objectively biased. Because Oswald has failed to demonstrate that the prospective jurors were in fact biased and the court

erred by denying his motions to strike them, his argument that he was denied his full statutory entitlement to peremptory strikes because of his efforts to correct the court's error has no merit and fails.

## JUROR MISCONDUCT

¶ 38. Oswald argues that on the fourth day of voir dire the court misused its discretion when it denied his request for an investigation into allegations of possible juror misconduct. The allegations of possible juror misconduct initially arose during the voir dire of prospective juror Roger K. When the court asked him about how much media exposure he had had, Roger K. replied, "I know I've learned more in the last 3 days here sitting down there in that [waiting] room about this case than I have since the day that it happened."

¶ 39. After Roger K.'s admission, Oswald requested that the court strike him for cause and conduct an investigation into the content of prospective jurors' conversations in the waiting room. The court denied both requests.[7] However, the court permitted the defense to question the remaining prospective jurors about the waiting room conversations but did not call any previously questioned jurors back to be examined on this topic. The defense questioned the remaining prospective jurors and the bailiff who supervised the waiting room. Two of the jurors who were

---

[7] Circuit courts are cautioned to err on the side of granting motions to remove jurors for cause because such a practice avoids the appearance of bias and in the long run may save the judiciary's time and resources. *See State v. Mendoza*, 227 Wis. 2d 838, 864, 596 N.W.2d 736, 749 (1999). In this case, the court granted twenty-one of Oswald's twenty-seven motions to strike jurors for cause. Oswald does not appeal the court's denial of his motion to strike Roger K.

questioned admitted that conversations about Oswald's guilt took place in the waiting room.[8] Oswald again requested that the court conduct an inquiry of the jurors who had previously been qualified to serve on the panel and determine if they had participated in or been affected by the discussions of Oswald's guilt. This request was also denied.

¶ 40. At the postconviction hearing, Oswald's only additional evidence of juror misconduct was the testimony of prospective juror Jacqueline M. who had been stricken from the jury panel. Jacqueline M. testified that while in the waiting room, she heard at least three prospective jurors express opinions that Oswald was guilty and that the trial was a joke and a waste of time. She stated that one of these jurors, William S., was seated on the jury panel that decided the case.

¶ 41. In its oral decision denying Oswald's postconviction motion for a new trial, the court stated that it did not find Jacqueline M. to be credible. It noted that she had had many opportunities to report the alleged discussions to the court or bailiff but never mentioned them until she was contacted by the defense's investigators. The court inferred that because the defense presented no other witnesses to support its claim besides Jacqueline M. that no other witnesses supported her assertions. Most significantly, the court stressed that she had given false answers on her juror questionnaire. In response to questions about if she had any physical or emotional problems which might interfere with jury service, if she had ever been the victim of physical violence, and if she had been

---

[8] For example, one juror testified that none of the other prospective jurors was trying to convince him of a certain opinion but would express opinions that Oswald was guilty.

involved in a violent or assaultive relationship, Jacqueline M. said "no."

¶ 42. To the contrary on cross-examination during voir dire, she testified that twenty-three days before signing her questionnaire she was physically assaulted by her husband with a fireplace poker and during the assault feared that her life was in imminent danger. She also testified that the police had been called to her home to remove her son, that the police noted that she had been drinking alcohol, and that this was a period of significant turmoil in her life in which she was prescribed psychotropic medications. The court concluded that Jacqueline M.'s testimony was unreliable because these events occurred within two or three weeks of her filling out the juror questionnaire, and on the questionnaire she failed to include them. The court also held that Oswald failed to make a sufficient showing that misconduct occurred.

¶ 43. On appeal, Oswald apparently argues that the trial court erred by denying his request to further inquire into the juror misconduct allegations because it prevented him from learning whether William S. gave false answers during voir dire and was actually biased. He claims that William S. did not admit to such a strong conviction of Oswald's guilt during voir dire as Jacqueline M. alleges he expressed in the waiting room. Because a prospective juror incorrectly answered a material question during voir dire, he requests a new trial.

■

¶ 44. A trial court has broad discretion over how a voir dire examination is conducted, including the form and number of questions asked of prospective jurors. *See Hammill v. State*, 89 Wis. 2d 404, 408, 278 N.W.2d 821, 822 (1979). Accordingly, we will not dis-

turb the court's voir dire decisions without a showing that the court misused its discretion. *See id.* at 408, 278 N.W.2d at 822–23.

¶ 45.  After a review of the voir dire and postconviction hearing records, we too conclude that Oswald failed to make a sufficient showing of juror misconduct to warrant a new trial. Oswald bases his claim of juror misconduct on his allegation that William S. gave false answers to voir dire questions. When a prospective juror gives erroneous answers during voir dire, a new trial will only be awarded if "the juror incorrectly or incompletely responded to a material question on *voir dire*; and if so, . . . it is more probable than not that under the facts and circumstances surrounding the particular case, the juror was biased against the moving party." *State v. Wyss*, 124 Wis. 2d 681, 726, 370 N.W.2d 745, 766 (1985), *overruled on other grounds by State v. Poellinger*, 153 Wis. 2d 493, 451 N.W.2d 752 (1990). Therefore, Oswald must show that the court erred by denying his request to investigate the previously impaneled jurors because if the court had granted it, information would have arisen that William S. gave incorrect answers to a material question and was prejudiced against him. Oswald has failed to demonstrate either of these factors.

¶ 46.  First, Oswald fails to produce evidence that William S. gave an incorrect voir dire answer. Assuming the veracity of Jacqueline M.'s testimony, her allegation is that the prospective jurors in the waiting room discussed opinions that Oswald was guilty. This is entirely consistent with the opinion William S. expressed in voir dire questioning. William S. admitted that he did have an opinion in his juror questionnaire and in voir dire questioning. He testified that from what he had seen, he would have a hard time believing

that Oswald was not involved. But, he also expressed a willingness and ability to put his opinion aside and listen to the evidence. Accordingly, Oswald does not provide evidence showing that William S. lied during voir dire because William S.'s admissions during voir dire were consistent with the alleged waiting room conversations.

¶ 47.  Second, Oswald does not demonstrate that William S. was prejudiced against him. Considering Jacqueline M.'s characterization of the prospective juror discussions in the context of William S.'s voir dire answers, it appears that the prospective jurors were referring to their opinions that based on the pretrial publicity and media coverage, Oswald participated in the charged crimes. As we have previously discussed, if a prospective juror held the opinion that Oswald participated in the crimes, the prospective juror was not biased against Oswald because such an opinion was consistent with his coercion defense strategy.[9] Based on these reasons, we find that Oswald did not sufficiently prove that William S. gave incorrect voir dire answers or was prejudiced against him. The court's denial of Oswald's motion for a new trial was a proper exercise of discretion.

## INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 48.  Oswald argues that he was denied effective assistance of trial counsel in three respects. First, he maintains that counsel conducted voir dire in a deficient manner. Second, he insists that because of the continuous and pervasive publicity that created a "circus-like atmosphere" for his trial, his counsel was

---

[9] *See supra* text pp. 69, 79-80.

deficient for failing to request a change of venue. Lastly, he objects to his counsel's failure to properly investigate and advance a mental disease or defect defense.

¶ 49. There are two components to a claim of ineffective assistance of counsel: a demonstration that counsel's performance was deficient and a demonstration that such deficient performance prejudiced the defendant. *See State v. Smith*, 207 Wis. 2d 258, 273, 558 N.W.2d 379, 386 (1997). Oswald has the burden to prove both components. *See id.* An attorney's performance is not deficient unless it is shown that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *State v. Guck*, 170 Wis. 2d 661, 669, 490 N.W.2d 34, 38 (Ct. App. 1992) (citation omitted). We thus assess whether such performance was reasonable under the circumstances of the particular case. *See State v. Hubanks*, 173 Wis. 2d 1, 25, 496 N.W.2d 96, 105 (Ct. App. 1992). Deficient performance is limited to situations where the law or duty is clear such that reasonable counsel should know enough to raise the issue. *See State v. McMahon*, 186 Wis. 2d 68, 85, 519 N.W.2d 621, 628 (Ct. App. 1994).

¶ 50. Even if deficient performance is found, we will not reverse unless the defendant proves that the deficiency actually prejudiced his or her defense: that counsel's errors were so serious as to deprive the defendant of a fair trial—a trial whose result is reliable. *See State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845, 848 (1990). In other words, errors of counsel must actually have an adverse effect on the defense, for not every error that conceivably could have influenced the outcome undermines the reliability of the result in the proceeding. "[T]here [must be] a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 129, 449 N.W.2d at 848 (citation omitted).

¶ 51. Whether counsel's actions constitute ineffective assistance is a mixed question of law and fact. *See State v. Pitsch*, 124 Wis. 2d 628, 633–34, 369 N.W.2d 711, 714 (1985). We will not overturn a circuit court's findings of fact concerning the circumstances of the case and counsel's conduct and strategy unless the findings are clearly erroneous. *See State v. Knight*, 168 Wis. 2d 509, 514 n.2, 484 N.W.2d 540, 541 (1992). However, the final determinations of whether counsel's performance was deficient and prejudiced the defense are questions of law which this court decides without deference to the circuit court. *See id.*

### A. Voir Dire

¶ 52. Oswald contends that his counsel's performance during voir dire was deficient during the questioning of three prospective jurors. Counsel's performance was ineffective, he argues, because these jurors admitted bias and counsel failed to ask follow-up questions of them or move the court to strike them for cause. To the contrary, after reviewing the record of voir dire and counsel's *Machner*[10] testimony, we conclude that counsel's conduct of voir dire was not deficient.

¶ 53. Oswald argues that his counsel conducted voir dire in the same manner as was held deficient in *State v. Traylor*, 170 Wis. 2d 393, 489 N.W.2d 626 (Ct. App. 1992), and *State v. Zurfluh*, 134 Wis. 2d 436, 397

---

[10] *State v. Machner*, 101 Wis. 2d 79, 303 N.W.2d 633 (1981).

N.W.2d 154 (Ct. App. 1986). In *Zurfluh*, a prospective juror expressed to the court during voir dire that she felt she "might not be able to be fair." *See Zurfluh*, 134 Wis. 2d at 439, 397 N.W.2d at 155. The court proceeded to explain a juror's duties, and the prospective juror replied that she understood them. Next, the court asked her if she would have a problem making a fair and impartial determination of the evidence. The prospective juror replied: "I don't know. I might. I'm afraid I might. I wouldn't want to have; but I'm afraid I might. I'm just being honest." *Id.*

¶ 54. The circuit court refused to remove the juror for cause. *See id.* It believed that the prospective juror, despite expressing difficulties, could still impartially decide the case. We disagreed. *See id.* We held that because the prospective juror expressed significant doubts in her ability to decide the case fairly and impartially, the court should have further questioned her about these doubts. *See id.* Without any additional clarification of the prospective juror's doubts, we determined that she was partial and should have been dismissed for cause. *See id.*

¶ 55. The *Traylor* court applied the *Zurfluh* holding and found a defense counsel's performance deficient for failing to ask follow-up questions of a prospective juror that would conclusively determine whether the prospective juror would follow the law as instructed by the court. *See Traylor*, 170 Wis. 2d at 399, 489 N.W.2d at 628. For example, counsel performed deficiently by not assessing through follow-up questions whether a prospective juror would follow the court's instructions when the prospective juror only stated that she "would try" to follow them. *See id.* at 398, 489 N.W.2d at 628. We held that counsel should have sought a more conclusive response from the pro-

spective juror about her ability to follow the law as instructed by the court, and if counsel failed to receive a satisfactory answer, counsel should have moved to strike the juror for cause. *See id.* at 399–400, 489 N.W.2d at 628.

¶ 56.   With these legal standards in mind, we will now examine defense counsel's contested voir dire conduct. We begin with the questioning of prospective juror, James H. First, the circuit court quizzed James H. about his statement in his questionnaire that "any armed person fleeing from the police tends to appear guilty." James H. reaffirmed to the court that he believed that such acts made an individual appear guilty. However, while responding to questions from the prosecutor, James H. later stated that he believed that he could decide Oswald's guilt or innocence based only on the evidence presented at trial. Defense counsel then asked James H. six questions. Counsel first quizzed the juror about if he had formed any opinions about Oswald's guilt. James H. replied, "[T]ruthfully . . . at this point he would appear to be guilty." Counsel responded by asking him how strong this opinion was, if he favored one side or the other, and if he was impartial. James H. admitted that he might not be completely impartial, but that he was a fair man, did not favor one particular side and would listen to arguments and the evidence.

¶ 57.   Oswald also contests his counsel's voir dire questioning of Dorothy L., who stated that she held an opinion that Oswald was guilty. In response to the prosecutor's questions, Dorothy L. stated that she would keep an open mind and listen to the evidence. When questioned about the hypothetical that if she were asked, would she be able to vote to convict Oswald at that very moment, Dorothy L. responded that she

would be unable to do so without the State presenting evidence of the crimes. Defense counsel asked her numerous questions to which she stated that she would do her very best to consider all the evidence, that her mind was not set to the outcome, and that she was willing to hear arguments regarding a coercion defense.

¶ 58. The final contested voir dire questioning was that of Joy H. Like the other prospective jurors, Joy H. expressed her opinion in her juror questionnaire that Oswald was guilty. When asked by the court about this statement, she replied that she would need to listen to the testimony and evidence before reaching an ultimate decision on Oswald's guilt. The court proceeded to ask her if she could set aside her opinion and make her decision on the evidence presented at trial. Joy H. replied:

> Well, in all honesty I think that would be pretty difficult to do. It's hard for me to understand anybody in this area . . . would be able to put that out completely, you know. I mean I wouldn't say that I couldn't try, but I'm saying . . . it would be difficult not to have some prior information influence my decision.

¶ 59. During questioning from the prosecutor, Joy H. stated that just because she has a certain opinion now does not mean that the opinion would not change after the evidence was presented. She stated she would wait until she heard all the evidence to conclusively make up her mind. Again, the prosecutor asked her if she could set her opinion aside and only judge guilt based on the trial evidence. Joy H. responded: "I know I'm supposed to say yes. I don't know. I don't think so. I think it would be very tough. It

would be very optimistic for me to say I could do that. . . . I don't think it's quite humanly possible to tell you the truth."

¶ 60.   After the prosecutor repeated the question, Joy H. said, "I would hope that I could" set aside my prior opinion and judge the case only on the evidence presented. She then affirmatively answered the prosecutor's question regarding whether she was willing to follow the law per the court's instructions. She replied, "It's difficult but I would try" to be a fair and impartial juror.

¶ 61.   Defense counsel then asked Joy H. numerous questions, including the following excerpted testimony.

> Q   . . . I know I'm going to be following up on things that I know you have strong opinions. . . . Is there anything else that you need to tell us about . . . your ability to be fair and impartial in this case?
>
> A   . . . I don't come to the table impartial by any means at this point.
>
> Q   Do you find yourself having a bias towards one particular side or the other?
>
> A   Yes. . . . I would be biased against your client.
>
> . . . .
>
> Q   You know, the other thing you said that I wanted to ask you about that you indicated talking about my client you said that young man that you had an opinion that he needs to take responsibility. Now I'd like to ask you have you formed this opinion now before the case is even started. Do you feel that your mind is set that he is responsible for the offenses he's charged with?

A   Is it set like in stone? I have that opinion . . . and it is before [the trial] starts . . . so I guess the answer is, yes, I do have it. If you're asking could it ever be changed I guess anything is possible.

. . . .

Q   I don't want to suggest that it would be required that you have to forget everything that you know because that's not going to be possible either, but I guess we all keep coming back to this point is whether or not . . . the opinions that you have are so strong that it's going to make it impossible for you to be impartial in this case? Can you answer that?

A   I think . . . they probably are. They are strong enough. It would be difficult. It would be difficult.

. . . .

Q   I guess I'm just trying to understand whether or not . . . [your opinion is] set to the point or so strong . . . that you can't be open to hearing both sides and deciding the case just on the evidence and the legal instructions?

A   . . . I certainly would listen, I would certainly listen, but I do think that . . . my opinions and my bias [are] strong to begin with and I think it would influence or . . . it would play a part . . . in how I hear the rest of the evidence or what I do with the rest of the evidence.

Q   You seem to have some concerns that even though you may be asked to set it aside and decide on the evidence that you couldn't do that?

A   Yes, I do have concerns with that.

¶ 62.   After reviewing the voir dire record, two things are apparent. First, each juror expressed an initial opinion that Oswald was guilty and equivocated to some degree in responses to questions about the

94

strength of that opinion and his or her ability to put it aside. Second, the record reveals substantial questioning and dialogue between the jurors and the court, prosecution and defense. In each instance, defense counsel sought clarification of the juror's opinions by asking follow-up questions. Defense counsel conducted much more thorough questioning about the prospective juror's expressed doubts than was conducted in *Traylor* or *Zurfluh,* and his performance cannot be categorized as deficient in this respect.

¶ 63.　However, Oswald raises one additional contention. He claims that his counsel was also deficient for not requesting that these jurors be stricken for cause. Whether defense counsel should move the court to strike a juror for cause is his or her tactical decision to make. *See State v. Brunette,* 220 Wis. 2d 431, 444–45, 583 N.W.2d 174, 180 (Ct. App.), *review denied,* 220 Wis. 2d 366, 585 N.W.2d 158 (1998). To show deficient performance, Oswald must show that his counsel's representation was objectively unreasonable. *See id.* at 445–46, 583 N.W.2d at 180.

¶ 64.　At the *Machner* hearing, defense counsel testified that he expected that potential jurors would have preconceptions about whether Oswald participated in the crimes due to the extensive media coverage. His main focus in selecting jurors was to seek those who would be open to the coercion defense strategy. He was not overly concerned that a juror had a guilty opinion because such an opinion only addressed the juror's belief that Oswald had participated in the crimes, which would not be contested at trial.

¶ 65.　Counsel testified that he did not request that Joy H. be stricken for cause because there was more to her than just the answers she told the court. "[W]e felt that underneath we had an open-minded

person that would really listen to what we were trying to say despite her reservations." Counsel added that he based these conclusions on the following facts: she was married to a university professor, her political and personal beliefs and experiences, and the honesty of her answers. Likewise, counsel testified that he viewed Joy H. and Dorothy L., both mothers, as "inherently more sensitive to the issues." Counsel felt that Dorothy L. expressed some openness to the coercion theory. Counsel was not directly questioned about why he did not move to strike James H.

¶ 66.   Based on counsel's testimony, counsel sought jurors with the ability to be open to considering the theory of defense, in spite of any preconceptions they may have had about Oswald's guilt. He decided that James H., Joy H. and Dorothy L. would all be good jurors because they would be open to the defense's strategy. We conclude that defense counsel's decisions not to move to strike these jurors were reasonable, tactical decisions and do not constitute deficient performance.

## B.   Change of Venue

¶ 67.   Oswald asserts that he was denied his right to effective assistance of counsel by his counsel's failure to request a change of venue for his trial. Because the charged criminal activities received enormous media coverage, including live television coverage of his capture, he alleges that the potential jurors in the county were "inflamed and prejudiced." This assertion is proved, he contends, by the fact that in the juror questionnaires the potential jurors not only admitted media exposure, but also evidenced that they were "hopelessly infected with bias[ ]."

96

¶ 68. Normally, the proper venue for a criminal trial is the county where the crime was committed. *See* § 971.19(1), STATS. A defendant may request the court to change the trial's venue to another county if securing an impartial jury is not possible in the county where the crime occurred. *See* § 971.22(1), STATS. When a defendant is represented by counsel, he or she delegates tactical decisions to counsel. *See Brunette*, 220 Wis. 2d at 443, 583 N.W.2d at 179. Whether a case necessitates a change of venue request is such a tactical decision that a criminal defendant has delegated to counsel. *See State v. Hereford*, 224 Wis. 2d 605, 617, 592 N.W.2d 247, 252 (Ct. App.), *review denied*, 225 Wis. 2d 490, 594 N.W.2d 384 (1999).

¶ 69. At the *Machner* hearing following Oswald's conviction, his trial counsel defended his tactical decision for not requesting a change of venue. Counsel acknowledged that the case had received extensive media coverage and that some of the media reports were erroneous and prejudicial. However, he claimed that he balanced the extensive publicity against two other factors affecting the case. He first theorized that Oswald's requested severance of his trial from his codefendant father was more likely to be granted without a change of venue motion because his father had already requested that the court change the venue for his trial. His second consideration was the planned defense strategy for trial.

¶ 70. In light of the State's strong evidence against Oswald—video tapes depicting Oswald's flight with a hostage and his capture while armed and wearing a bulletproof vest, eyewitnesses, ballistics evidence, his handwritten plans for the crimes and his confession to police officers—defense counsel theorized

that the best defense for his client was that Oswald performed the criminal acts because he was coerced to do so by his father. Counsel testified that:

> [W]e ultimately were convinced that it would be preferred . . . to seek the . . . jury . . . from Waukesha County despite the fact that a lot of people had seen the video and were well aware . . . of the facts of this case. And I think the reason for that was . . . [a] feeling among the community that Ted Oswald's position was different from that of his father; that the relationship between father and son was so unusual that the coercive aspects of our presentation were . . . put forth [by] the media. . . . [T]he image of our client was fairly intact of a young high school student . . . look[ing] very young, very vulnerable, very impressionable. . . . [W]e felt that that was entirely consistent with the defense that we chose to present in this case . . . and we concluded that there would be benefit from having a jury impaneled in Waukesha County.

¶ 71. Counsel presented well-reasoned testimony in support of his strategy, and it is not this court's prerogative to second-guess counsel's reasonable tactical decisions. *See State v. Felton*, 110 Wis. 2d 485, 502, 329 N.W.2d 161, 169 (1983). We reject Oswald's contention that his counsel was deficient for not requesting a venue change after reviewing the prospective jurors' answers to the juror questionnaires. The opinions expressed in the questionnaires only regarded opinions the prospective jurors held about Oswald's alleged participation in the crimes. The opinions revealed by the questionnaires did not reflect on Oswald's state of mind, which was the focus of his coercion defense. His counsel's actions in this regard

cannot be construed as deficient but rather are consistent with the planned defense strategy.

¶ 72.   Oswald's only remaining arguments are that: (1) in reaching the conclusion that a coercion defense was feasible, counsel failed to conduct a systematic polling of the Waukesha county community; and (2) Oswald's case was eventually severed from his father's two months prior to trial, allowing plenty of time for counsel to request a venue change. Neither of these contentions evidences deficient performance. Conducting a systematic opinion poll of the county is not an act that is considered necessary for professionally competent assistance. Additionally, the decision of whether to request a change of venue is a tactical decision under the control of defense counsel. Counsel testified that he weighed the alternatives of the case and in his professional judgment the best possible defense for his client was to argue coercion and that a coercion defense would be benefited by remaining in the county. We conclude that counsel was not deficient for failing to request a change of venue.

## C.   Mental Disease Defense

¶ 73.   Oswald's final argument that his counsel was ineffective is that his counsel did not sufficiently investigate or advance a defense that Oswald should be exonerated of responsibility because of a mental disease or defect. Although Oswald admits that he actively participated in the decision not to pursue a mental disease defense, he now claims that this decision was not a fully informed one. At the postconviction hearing, the defense's expert witness, Minnesota psychologist Dr. James Gilbertson, confessed that he was unfamiliar with Wisconsin's legal standard for a

mental disease defense. He further testified that if he had been aware of Wisconsin's legal standard for a mental disease defense, he would have opined that Oswald satisfied this threshold. As a result, Oswald asserts that if his counsel had performed effectively, Gilbertson's support for a mental disease defense would have been revealed. This was prejudicial, he argues, and denied him a potentially viable defense.

¶ 74.   At the postconviction hearing, trial counsel stated that he had considered a mental disease defense from the beginning of the case. Counsel retained a psychologist, Dr. Gary Kendziorsky, who he had previously used and trusted. After interviewing Oswald, Kendziorsky concluded that he was not mentally ill.

¶ 75.   Counsel determined that mental disease was not a viable defense on the basis of Kendziorsky's evaluation and other factors. He testified that Oswald was adamant about not wanting to "play the 'crazy game' " and enter a mental disease defense. Counsel further stated that he discussed the strategic considerations about pursuing such a defense with his client. They discussed that Oswald would be evaluated by court and state examiners and that the State could receive evidence from these examinations about Oswald's state of mind, potentially weakening the coercion defense. Counsel averred that he believed a mental disease defense was inconsistent with how Oswald presented himself, how others described him and the planned coercion defense. Counsel recommended to Oswald that they focus on the coercion defense and not pursue a mental disease defense. Oswald accepted his counsel's recommendation.

¶ 76.   Oswald now complains that this was an ill-informed decision. He claims that his counsel should

have learned that Gilbertson, a psychologist the defense hired to render an opinion supporting the coercion defense, would have also supported a mental disease defense. Gilbertson's initial mental disease determination was based on an erroneous assumption about Wisconsin's legal standard. He testified that Oswald suffered from a "complex posttraumatic stress disorder" that was not a generally accepted diagnosable disease but could satisfy Wisconsin's legal standard. Oswald maintains that if he had been effectively represented, his counsel would have continued serious consideration of a mental disease defense.

██

¶ 77.    The State replies that the record indicates that counsel fully considered a mental disease defense, and Oswald consented to its rejection. Additionally, it argues, "[C]ounsel was not required to continue shopping for a different expert opinion after he received a reliable opinion from a qualified expert . . . ." We agree. In light of the circumstances, counsel made an adequate inquiry into a possible mental disease defense. "Competent representation does not demand that counsel seek repetitive examinations of the defendant until an expert is found who will offer a supportive opinion." *California v. Williams*, 751 P.2d 395, 437 (Cal. 1988). Oswald's ability to produce a conflicting psychological evaluation at the postconviction hearing does not in itself establish that the factual inquiry was inadequate. The record reveals that his counsel made a reasoned and considered choice to abandon the mental disease defense based on the facts of the case and his judgment of the most appropriate trial strategy. Because counsel's strategic decision was rationally founded on the facts and the law, we conclude that his representation was not deficient.

## CONCLUSION

¶ 78. In summary, we determine that even though the prospective jurors expressed opinions that Oswald was guilty, they were not biased against him. The prospective jurors were not subjectively biased because each prospective juror confirmed that he or she was willing to put the guilty opinion aside, nor were they objectively biased because they did not have ingrained attitudes opposed to the coercion defense. A new trial because of juror misconduct is not warranted because Oswald did not present sufficient proof that the impaneled jurors lied during voir dire and were prejudiced against him.

¶ 79. Similarly, Oswald's request for a new trial because of the ineffective assistance of his trial counsel fails. His counsel conducted adequate voir dire questioning of prospective jurors and made reasonable, tactical decisions on which jurors to request that the court strike for cause. Finally, regarding counsel's decisions not to request a change of venue or pursue a mental disease defense, counsel did not perform deficiently but made well-reasoned, considered and strategic decisions seeking the best interests of his client.

*By the Court.*—Judgment and order affirmed.

¶ 80. NETTESHEIM, J. *(concurring).* I concur for the same reasons stated in my concurring opinion in *State v. James Oswald,* 2000 WI App 3, 232 Wis. 2d 103, 606 N.W.2d 238 released this same day.