STATE of Wisconsin, Plaintiff-Respondent,

v.

James H. OSWALD, Defendant-Appellant.†

Court of Appeals

*Nos. 97–1219–CR, 97–1899–CR. Submitted on briefs September 23, 1999.—Decided December 8, 1999.*

## 2000 WI App 3

(Also reported in 606 N.W.2d 238.)

†Petition to review denied.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *James L. Fullin* of *Fullin Law Office* of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *Sally L. Wellman*, assistant attorney general.

Before Brown, P.J., Nettesheim and Anderson, JJ.

¶ 1. BROWN, P.J. James H. Oswald was convicted of twenty felony counts on May 30, 1995, after a jury trial. The charges stemmed from a bank robbery, an escape in a stolen car, a shootout with police officers and the resulting death of Captain James Lutz of the City of Waukesha Police Department. The gunfire exchange with the police was captured on videotape by a television reporter and widely broadcast. Oswald raises several arguments on appeal, the most noteworthy being that several jurors should have been struck for cause. In light of the Wisconsin Supreme Court's recent clarification of Wisconsin law on juror bias, we address this issue at length. Ultimately, we conclude that the trial court did not err by refusing to strike the jurors Oswald claims were biased. We additionally reject Oswald's other arguments and affirm.[1]

¶ 2. We begin with a brief recitation of the facts, which we will supplement later as needed. Oswald,

---

[1] Oswald first appealed only his judgment of conviction. He then moved this court to consolidate that appeal with another attacking the trial court's order denying postconviction relief. We granted the motion to consolidate.

along with his son Theodore, robbed a bank in Wales, Wisconsin, on the morning of April 28, 1994.[2] They fled and traveled toward Waukesha. Two Waukesha police officers stopped the Oswald vehicle, at which point the Oswalds, armed with semi-automatic rifles, got out of the vehicle and shot at the officers, killing one. A chase ensued, during which the Oswalds forced their way into a private residence, took a woman who was inside hostage and forced her to drive them away in her vehicle. The chase ended in a shootout between the Oswalds and numerous police officers, in which two officers and the hostage sustained gunshot wounds. By the time of the shootout, local media had gotten wind of the incident and the shootout was filmed live and rebroadcast extensively.

¶ 3. Oswald was charged with a variety of felonies and convicted by a jury of twenty felony counts. On appeal he raises several claims, grouped into the following categories: juror bias, right to self-representation, right to representation by retained counsel of his choice, evidentiary issues and responsibility plea. We address them in that order, adding facts where relevant.

## 1. Juror Bias

¶ 4. On July 8, 1999, the Wisconsin Supreme Court released four opinions discussing juror bias. *See State v. Faucher*, 227 Wis. 2d 700, 596 N.W.2d 770 (1999); *State v. Kiernan*, 227 Wis. 2d 736, 596 N.W.2d 760 (1999); *State v. Erickson*, 227 Wis. 2d 758, 596 N.W.2d 749 (1999), *cert. denied*, 120 S.Ct. 987 (2000); *State v. Mendoza*, 227 Wis. 2d 838, 596 N.W.2d 736

---

[2] Theodore also appealed his conviction. *See State v. Oswald*, 2000 WI App 2, 232 Wis. 2d 62, 606 N.W.2d 207.

(1999). In those cases, the court clarified the previously turbid state of juror bias jurisprudence in Wisconsin, adopting the terms "statutory," "subjective" and "objective" bias to replace the misused "implied," "actual" and "inferred" bias terminology. *See Faucher*, 227 Wis. 2d at 705–06, 596 N.W.2d at 773. A person is statutorily biased if he or she "is related by blood or marriage to any party or to any attorney appearing in the case" or "has any financial interest in the case." Section 805.08(1), STATS. Subjective bias refers to the prospective juror's state of mind. *See Faucher*, 227 Wis. 2d at 717, 596 N.W.2d at 778. Finally, a prospective juror is objectively biased if his or her relationship to the case is such that no reasonable person in the prospective juror's position could possibly be impartial, despite the desire to set aside any bias. *See id.* at 718, 596 N.W.2d at 778–79. We discuss these four cases with respect to our standard of review, subjective bias and objective bias.

### a. Standard of Review

¶ 5. In reviewing a trial court's determination of subjective and objective bias, we give two different levels of deference to the trial court's conclusions.[3] First, the trial court's determination of subjective bias will be upheld unless clearly erroneous. *See Kiernan*, 227 Wis. 2d at 745, 596 N.W.2d at 764. We employ the clearly erroneous standard because the trial court is in the unique position to assess the prospective juror's demeanor and tone. *See id.* We will not second-guess these observations when all we see is a cold record.

---

[3] Oswald does not allege that any one of the jurors was statutorily biased.

Second, the trial court's determination of objective bias will be reversed only if, as a matter of law, a reasonable judge could not have reached the same conclusion. *See id.*; *Faucher*, 227 Wis. 2d at 721, 596 N.W.2d at 780. This is a higher standard of review than the clearly erroneous standard but still very deferential to the trial court's conclusions. *See Faucher*, 227 Wis. 2d at 720, 596 N.W.2d at 779. We employ this intermediate standard because the trial court's conclusion on the question of law of whether the facts add up to objective bias is so intertwined with the factual findings supporting that conclusion. *See id.* Thus, our review of a trial court's determination of both subjective and objective bias is deferential, though less so for objective bias than subjective. *Compare id.* at 718, 596 N.W.2d at 778, *with id.* at 718–21, 596 N.W.2d at 778–80.

### b. Subjective Bias

¶ 6. *Faucher, Kiernan, Mendoza* and *Erickson* nail down the proposition that "questions as to a prospective juror's sincere willingness to set aside bias should be largely left to the circuit court's discretion." *State v. Ferron*, 219 Wis. 2d 481, 501, 579 N.W.2d 654, 662 (1998). In *Ferron*, a prospective juror "continued to express his belief that criminal defendants who elect not to testify on their own behalf are guilty." *Id.* at 500, 579 N.W.2d at 662. The record reflected that this juror refused to recognize a fundamental constitutional right despite the trial court's repeated instructions. After much dialogue with the trial court, the best the juror could muster was that he "probably" could set aside his bias. *See id.* at 501, 579 N.W.2d at 662. The result of that case may have inadvertently encouraged the criminal defense bar to base claims of bias on particular words. However, the *Ferron* court made it clear that

111

"[t]here are no magical words that need be spoken by the prospective juror, and the juror need not affirmatively state that he or she can 'definitely' set the bias aside." *Id.* The recent juror bias cases confirm this holding. Now, it is clear that "a prospective juror need not respond to voir dire questions with unequivocal declarations of impartiality." *Erickson*, 227 Wis. 2d at 776, 596 N.W.2d at 759; *see also Faucher*, 227 Wis. 2d at 731 n.8, 596 N.W.2d at 784 ("[A] prospective juror need not unambiguously state his or her ability to set aside a bias."). It is not just the juror's words that are important. The manner in which the juror says the words and the body language he or she exhibits while answering speak volumes—volumes that are not transmitted to a reviewing court via the cold record. Our inability to review demeanor and thus assess sincerity is precisely why we leave the determination of subjective bias to the circuit court. *See Erickson*, 227 Wis. 2d at 776, 596 N.W.2d at 759 (noting appellate court's inability to assess whether the juror's "I think so" was stated with earnestness or timidity). Thus, when reviewing a circuit court's decision on subjective bias, we do not focus on particular, isolated words the juror used. Rather, we look at the record as a whole, using a very deferential lens, to determine if it supports the circuit court's conclusion.

¶ 7. We understand that there are those who will read this opinion and say, "But in *Ferron*, the supreme court did not pay deference to the trial court. If *Ferron* is to have any continuing vitality at all, then it must stand for the proposition that when a juror expresses a strongly held bias and then makes an equivocal commitment to set that bias aside, the trial court's finding of impartiality deserves a low level of deference or no deference at all and the reviewing court must find sub-

jective bias as a matter of law." We disagree with that interpretation. *Ferron* was a special case with unique facts. It was those unique facts—a juror who expressed an intractable bias against a defendant's constitutional right to a presumption of innocence in the face of the defendant's possible election not to testify on his own behalf—which led the supreme court to reach the result it did. *Ferron* does not demand that prospective jurors give unequivocal assertions of impartiality on voir dire.

### c. Objective Bias

¶ 8. Study of *Faucher, Kiernan, Erickson* and *Mendoza* reveals that exclusion of a juror for objective bias requires a direct, critical, personal connection between the individual juror and crucial evidence or a dispositive issue in the case to be tried or the juror's intractable negative attitude toward the justice system in general.

¶ 9. One situation when a juror must be dismissed for cause because of objective bias is when the juror has a direct connection to crucial evidence to be presented at trial. For example, in *Faucher*, the juror was acquainted with the State's key witness and told the trial court that he believed her to be a "person of integrity . . . [who] wouldn't lie." *See Faucher*, 227 Wis. 2d at 708, 596 N.W.2d at 774. The case boiled down to a credibility contest between a sole eyewitness—the woman with whom the juror was acquainted—and the defendant. *See id.* at 707, 596 N.W.2d at 773. Together, the juror's firmly held belief that the witness, with whom he was personally acquainted, was incapable of lying and the fact that her testimony was the cornerstone of the State's case established the juror's objective bias.

¶ 10. In contrast, a juror's connection to crucial evidence does not establish objective bias if the connection is remote. In *Erickson*, the challenged juror had been a victim of sexual abuse as a child. The trial court noted at voir dire that "often . . . in cases of this nature . . . it's one person's word against the other." *Erickson*, 227 Wis. 2d at 763 n.3, 596 N.W.2d at 753. When the juror replied that she did not feel that her own experience would make her more likely to believe the victim's testimony, the trial court refused to strike her for cause. *See id.* at 763, 596 N.W.2d at 753. Unlike the prospective juror in *Faucher*, this juror expressed no direct, personal relationship to the witness (in this case, the victim). Furthermore, her sexual assault experience was remote in time, thus lessening the chance it would taint her judgment. *See id.* at 763 n.5, 596 N.W.2d at 753.[4]

¶ 11. The trial court must also strike a juror for objective bias if the juror has a direct connection to a dispositive issue in the case, such as the defense theory, coupled with a personal belief regarding the outcome of that issue. *See Kiernan*, 227 Wis. 2d at 749–50, 596 N.W.2d at 766–67. In *Kiernan*, several of the jurors had sat on a case two days earlier in which the same defense attorney had tried a "carbon copy" of Kiernan's case using the same defense theory he planned to present for Kiernan. *See id.* at 740, 596 N.W.2d at 762. That theory was that breathalyzer

---

[4] In *Erickson*, the supreme court reasserted its reluctance to create new groups of people automatically excluded from jury service due to a supposed inherent bias in their status. *See State v. Erickson*, 227 Wis. 2d 758, 777, 596 N.W.2d 749, 759 (1999); *see also State v. Mendoza*, 227 Wis. 2d 838, 852 n.9, 596 N.W.2d 736, 744 (1999); *State v. Kiernan*, 227 Wis. 2d 736, 748–49, 596 N.W.2d 760, 766 (1999) (citing cases).

readings could be rendered inaccurately high when the subject had an object in his or her mouth. The trial court declined to remove the veteran jurors for cause. While the supreme court noted that "veteran jurors need not be removed for cause when called upon to decide multiple cases with similar issues and identical witnesses," it then went on to conclude that the particular jurors at issue were nevertheless objectively biased. *Id.* at 748–49, 596 N.W.2d at 765–66. At voir dire, the jurors had stated that they would conclude that breathalyzer tests are accurate absent operator error or machine malfunction. *See id.* at 749, 596 N.W.2d at 766. Given Kiernan's theory of defense, "[t]hose jurors had formed a steadfast opinion outside the confines of Kiernan's trial on the very issue they were being called upon to decide at her trial." *Id.* at 750, 596 N.W.2d at 767. Like the *Faucher* juror's premature conclusion about the credibility of the State's key witness, these jurors' pretrial conclusion that breathalyzer results are accurate went right to the heart of Kiernan's case. The jurors' direct, personal connection to the theory of defense constituted objective bias.

¶ 12. The third situation we discuss in which jurors must be struck for cause is when the jurors demonstrate an intractable negative attitude toward the justice system. For example, in *Mendoza*, the State moved to strike four jurors who had been convicted of crimes. *See Mendoza*, 227 Wis. 2d at 843, 596 N.W.2d at 739. The trial court, in an attempt to err on the safe side and avoid even the appearance of bias, removed the jurors. The supreme court, however, held that "the court's blanket decision to strike a class of jurors was an error of law." *Id.* at 853, 596 N.W.2d at 744. As with the veteran jurors in *Kiernan*, the previously convicted

panel members should not have been excluded by virtue of that status alone. However, the error in striking on that status alone did not preclude the possibility that the four jurors, viewed as individuals, could have exhibited objective bias. Therefore, the supreme court examined the responses of each of the struck jurors to see if the record supported the trial court's decision to strike. *See id.* at 854, 596 N.W.2d at 744.

¶ 13. After reviewing the responses of the struck jurors, the supreme court held that three of the four challenged jurors should have been excluded because of their negative experiences with the criminal justice system and their resultant residual hostility. One of these jurors was set to begin serving his sentence for a drug offense in three weeks; his contact with the criminal justice system was so "recent and continuing" as to render him objectively biased. *Id.* A second felt that a sentence imposed on him for an armed robbery of which he was convicted in 1966 "was too stiff" and "still bothered him." *Id.* at 854, 596 N.W.2d at 745. The supreme court held this "residual hostility" constituted objective bias. *Id.* at 855, 596 N.W.2d at 745. The third had been convicted of and incarcerated for burglary. He stated that he had been falsely accused and that "he thought people are set up by others who do not like them." *Id.* This attitude, too, constituted objective bias. Thus, the record supported the trial court's conclusion that three of the four struck jurors were objectively biased. In contrast, the supreme court held that no reasonable judge could have found the fourth struck juror to be objectively biased. That individual had pled guilty to a burglary about thirty years previously and stated that "he had no problem with the manner in which the police or prosecutor handled [his] case." *Id.* at 856, 596 N.W.2d at 745. No reasonable judge could

have concluded that this person was objectively biased, given the remoteness of his conviction and apparent lack of negative feelings toward the criminal justice system. *See id.*

### d. The Oswald Jurors

¶ 14. We now apply the juror bias analysis to Oswald's case. The trial court denied Oswald's motions to strike five jurors for cause. Two of these jurors remained on the panel and Oswald struck the other three using his peremptory strikes. He argues that the trial court erred in refusing to strike these jurors for cause, resulting in a violation of his right to an impartial jury and his right to peremptory strikes. Our review of the record leads us to conclude that the trial court did not err in refusing to strike the jurors.

¶ 15. Juror Rebecca B. testified that she formed the opinion that Oswald was guilty due to viewing the film of the shootout twice on television. She also stated that she generally based her decisions on her initial "gut feeling" and that this method of decision making had worked for her in the past. When the court asked her if she could set aside information she had received about the case and "view . . . evidence, listen to the instructions that I would give at the close of trial, apply the evidence to the facts . . . and be able to render a verdict at that time," she responded, "I just don't know if—I guess I have a strong feeling that what took place, that the media said took place, actually did take place and I don't know if I could be objective to say that. No. After hearing the evidence I don't know if I could." When asked if she would be "willing to listen to all of the evidence . . . before coming to [her] own . . . conclusions based upon the evidence," she responded, "Probably, yeah." Oswald claims that these responses

were too equivocal for the trial court to have concluded that Rebecca B. was not subjectively biased.

¶ 16. Oswald claims that Juror Patti H. should have been struck for both subjective and objective bias. First, she had seen the tape of the shootout and believed that it showed that "one of them [either Oswald or his son] is guilty." When asked about her ability to set aside what she had seen and heard and base her decision on the evidence presented at trial, she said, "As a juror I know I would have to . . . ." Oswald claims that her statement reflects subjective bias. Second, Oswald argues that Patti H. was objectively biased because her husband was a police officer. Given the defense theory in this case—that the slain officer had actually been killed by an errant bullet fired by another officer—Oswald argues that no wife of a police officer could put aside her bias in a case such as his.

¶ 17. Oswald goes on to contend that Juror Paul A. was also both subjectively and objectively biased. When asked if he could make a determination of guilt based on the evidence at trial and not on media coverage, Paul A. stated, "I would try to do my best." Oswald claims this equivocal reply demonstrates subjective bias. Furthermore, Oswald posits, Paul A.'s background as an immigration officer tainted him with objective bias.

¶ 18. Finally, Oswald claims that Jurors Debora S. and Thai V. should have been struck for objective and subjective bias, respectively. In Debora S.'s case, her two sisters and their husbands were law enforcement officers. This is enough to show objective bias here due to the nature of the case, Oswald opines. While Thai V. indicated on the jury questionnaire that he felt Oswald was guilty, he stated at voir dire that he

would be able to set aside his preformed opinion and judge the case based on the evidence presented. Nevertheless, Oswald claims that he exhibited subjective bias.

■

¶ 19. We first examine Oswald's claims of subjective bias, on which prong Oswald challenges jurors Rebecca B., Patti H., Paul A. and Thai V. After first admitting that seeing the shootout on television had made her think Oswald was guilty, Rebecca B. ultimately stated that she "probably" could set this belief aside and judge the case solely on the evidence presented at trial. With respect to Patti H., our review of the record leads us to agree with the State: "There is absolutely nothing in this record to indicate that [Patti H.] had a preconceived opinion of guilt, much less that she would be unable to put any such opinion aside and decide the case based on the evidence presented." Paul A., when asked if he could decide the case based solely on evidence presented in court and not be swayed by the pretrial publicity, stated, "I would try to do my best." Finally, Oswald relies on Thai V.'s written questionnaire to show subjective bias. But Thai V. clearly stated at voir dire that he could and would weigh the evidence presented and base his decision on that evidence alone. We repeat that a prospective juror need not give "unequivocal assurances" of his or her ability to set aside any prior knowledge or opinion about the case. *See Kiernan*, 227 Wis. 2d at 750 n.10, 596 N.W.2d at 767. The trial court is in a much better position than we to determine if a response of "probably" or "I'll try" is sincere. The record supports the trial court's decision not to strike any of these jurors for subjective bias and we will not overturn that decision. *See Mendoza*, 227 Wis. 2d at 849, 596 N.W.2d at 742.

¶ 20. Next, we examine and reject Oswald's claims of objective bias concerning Patti H., Paul A. and Debora S. Paul A. used to be a federal immigration officer. Both Patti H. and Debora S. have relatives in law enforcement. Citing *Kiernan* and *Mendoza*, Oswald contends that their close relationships to the profession would unfairly prejudice them against the defense theory of police error—that it was actually an errant bullet fired by another officer that killed the officer who died.

¶ 21. We are not persuaded. Neither experience as an immigration officer nor a familial relationship to a police officer creates the direct, personal connection to a dispositive issue in the case necessary to render a juror objectively biased. This is not a case like *Kiernan*, where the prospective jurors had previously decided the crucial issue in a carbon copy of Kiernan's case. *See Kiernan*, 227 Wis. 2d at 740, 596 N.W.2d at 762. There, the jurors stated at voir dire that they would reach a particular conclusion regarding the accuracy of breathalyzer tests—the very issue upon which Kiernan's theory of defense was based. *See id.* at 749–50, 596 N.W.2d at 766–67. There is nothing in the record here suggesting that these jurors' connections to the law enforcement field made them believe that police officers are infallible; their backgrounds did not foreclose Oswald's defense theory of police error. A reasonable person with some connection to law enforcement does not believe that police officers are incapable of error.

¶ 22. Neither is this a case like *Mendoza*, where jurors were objectively biased due to their ingrained negative attitude toward the criminal justice system. *See Mendoza*, 227 Wis. 2d at 854–56, 596 N.W.2d at

744–45. Oswald likens the jurors' positive relationship with law enforcement to the negative views held by the *Mendoza* jurors, claiming that such a close connection renders their partiality towards law enforcement impossible to set aside. But if a current, local police officer himself or herself is not so predisposed to favor an officer's version of events as to be considered objectively biased, *see State v. Louis*, 156 Wis. 2d 470, 482–83, 457 N.W.2d 484, 489–90 (1990), certainly a former immigration officer or relative of an officer is not objectively biased on that fact alone. A reasonable person could be impartial despite a relationship to an officer or past experience as an officer. This fact—that a reasonable person in the position of the prospective juror could be impartial—is the sine qua non of the absence of objective bias. *See Faucher*, 227 Wis. 2d at 718, 596 N.W.2d at 778–79. These jurors' relationship to law enforcement did not render them objectively biased.

¶ 23. Finally, even though Oswald does not base his objective bias argument on *Faucher*, some might argue that he would have been better off had he done so. We understand why he did not. The two cases are easily distinguished. In *Faucher*, the prospective juror knew the State's only eyewitness and was convinced that witness would not lie. *See Faucher*, 227 Wis. 2d at 732–33, 596 N.W.2d at 785. Furthermore, the *Faucher* case boiled down to a credibility battle between that witness and the accused. *See id.* at 733, 596 N.W.2d at 785. Here, Patti H. did state that she thought police officers were "more truthful" than others. But, the record does not show that she was personally acquainted with any of the officers who were to testify at trial. Also, there was no one witness upon whose testimony the entire State's case hung. The evidence

against Oswald was overwhelming and varied. *Faucher* does not help Oswald establish objective bias.

## 2. *Right to Self-Representation*

¶ 24. Oswald claims that the trial court violated his right to self-representation by not allowing him to represent himself until approximately one month before the trial was scheduled to begin, by denying him a continuance at that point and by denying him transcripts from Theodore's trial and recorded statements of the State's witnesses at that trial. We first relate the facts pertinent to these claims and then address their merit.

¶ 25. Oswald's case was originally consolidated with that of his son Theodore. However, Oswald moved to draw the jury from another county. When the court granted that motion, Oswald's trial was separated from Theodore's. Theodore was tried and convicted of nineteen of the same twenty felony counts of which Oswald was ultimately convicted. Theodore's trial ended several weeks before Oswald's began.

¶ 26. Oswald had three different attorneys before finally representing himself. His first attorney, Daniel Fay, was appointed for him by the state public defender. Oswald became dissatisfied with Fay and requested to proceed pro se. The court ordered an examination of Oswald to determine if he was competent to represent himself. After a hearing, the court denied Oswald's request. Later that week, Alan Eisenberg took over as attorney for Oswald and the trial court relieved Fay of any responsibility for the case. Eisenberg later withdrew, citing Supreme Court Rule 20:1.16(a)(1), which requires a lawyer to withdraw if representation will result in a violation of the Rules of Professional Conduct. *See* SCR 20:1.16(a)(1) (West

1998). Oswald again requested permission to represent himself. The trial court again denied Oswald's request. Douglas Bihler was then appointed by the state public defender. Three months later, Bihler moved the court to allow him to withdraw and allow two other private attorneys, Robert Sosnay and William Marquis, to represent Oswald. The court denied this request, holding that the trial strategy conflicts that had caused Fay, Eisenberg and Bihler to feel compelled to withdraw would probably continue with new counsel. Ultimately, however, the court did allow Bihler to withdraw and Oswald to represent himself, with Bihler remaining as standby counsel.

¶ 27. The trial court's decision to allow Oswald to proceed pro se occurred twenty-five days before the jury trial was scheduled to begin. Oswald requested a continuance, which the trial court denied. Oswald also requested the transcripts of Theodore's trial. The trial court denied this request, noting that most of the testimony had not then been transcribed.

a. Initial Denials of Requests to Proceed Pro Se

¶ 28. We first discuss the trial court's initial denials of Oswald's requests to represent himself. A defendant has a constitutionally protected right to proceed on his or her own behalf. *See State v. Klessig*, 211 Wis. 2d 194, 203, 564 N.W.2d 716, 720 (1997) (noting that right to self-representation is identical under state and federal constitutions). This right, however, is not absolute. *See State v. Haste*, 175 Wis. 2d 1, 22, 500 N.W.2d 678, 686 (Ct. App. 1993). Before allowing a defendant to waive the right to counsel and proceed pro se, the trial court must ensure that the defendant "(1) has knowingly, intelligently and voluntarily waived

the right to counsel, and (2) is competent to proceed pro se." *Klessig*, 211 Wis. 2d at 203, 564 N.W.2d at 720. To verify that the waiver is indeed knowing, intelligent and voluntary, the trial court must conduct a colloquy with the defendant to determine that he or she: "(1) made a deliberate choice to proceed without counsel, (2) was aware of the difficulties and disadvantages of self-representation, (3) was aware of the seriousness of the charge or charges against him [or her], and (4) was aware of the general range of penalties that could have been imposed on him [or her]." *Id.* at 206, 564 N.W.2d at 721. The trial court's decision whether the waiver was valid is reviewed de novo because it is a constitutional fact. *See id.* at 204, 564 N.W.2d at 721.

¶ 29. Oswald claims that the trial court based its initial denials of his requests to proceed pro se on the extent of Oswald's legal knowledge. Oswald is correct that lack of legal expertise is an impermissible basis on which to deny a request to represent oneself. *See* WIS J I—CRIMINAL SM–30A at 4 (citing *Faretta v. California*, 422 U.S. 806, 836 (1975)). However, we agree with the State that the basis for the trial court's decision was the lack of clarity in some of Oswald's responses during the colloquy. When asked if he understood the charges against him, Oswald answered, "Read them." When asked if anyone had threatened him to make him pursue self-representation, he replied, "Not that I know." Because these answers do not unequivocally demonstrate a knowing, intelligent and voluntary waiver, the trial court did not err in denying Oswald's initial requests to proceed pro se.

### b. Refusal to Grant Continuance

¶ 30. Next, Oswald claims that his right to self-representation was infringed by the trial court's refusal to grant him a continuance and to provide him with transcripts of Theodore's trial and written statements of the witnesses at Theodore's trial.

¶ 31. First, the decision to grant a continuance is one committed to the trial court's discretion, which we will reverse only if that discretion has been erroneously exercised. *See State v. Wollman*, 86 Wis. 2d 459, 468, 273 N.W.2d 225, 230 (1979). The decision requires the trial court to balance the defendant's right to adequate representation and the public's right to the efficient administration of justice. *See id.* In balancing those two interests, the trial court should consider the following factors:

 1. The length of the delay requested;

 2. Whether the 'lead' counsel has associates prepared to try the case in his absence;

 3. Whether other continuances had been requested and received by the defendant;

 4. The convenience or inconvenience to the parties, witnesses and the court;

 5. Whether the delay seems to be for legitimate reasons; or whether its purpose is dilatory;

 6. Other relevant factors.

*Id.* at 470, 273 N.W.2d at 231.

¶ 32. The trial court did not err in weighing the *Wollman* factors. While the requested delay was not long, the trial court's experience with Oswald and his

inability to work with his attorneys could justifiably have led it to believe that the request was in part dilatory. More importantly, the request was made shortly before a complex trial and would have necessitated rescheduling on the part of many people. Also, Oswald was intimately familiar with his case; he was not thrown cold into trial preparation at the eleventh hour, unfamiliar with the facts and issues. Furthermore, not only had Oswald consented to his attorney's withdrawal on the eve of trial, he had filed a motion with the court to discharge Bihler. Oswald, by his own desire, took over his own defense. Finally, Oswald fails to even allege that he was prejudiced by the trial court's denial of a continuance. *See id.* We uphold the trial court's denial of a continuance.

## c. Refusal to Provide Transcripts

¶ 33. Second, Oswald claims error in the trial court's refusal to provide him with transcripts of Theodore's trial. He points to *Britt v. North Carolina*, 404 U.S. 226, 227 (1971), which states that, as a matter of equal protection, the State must provide indigent prisoners with the tools of an adequate defense. The State responds that, when requesting the court to pay for transcripts, the defendant should have to show a particularized need for such transcripts.

¶ 34. We agree with the State. Oswald claims that *Britt* rejected the "particularized showing of need" requirement. *Id.* at 228. There, however, as in *Griffin v. Illinois*, 351 U.S. 12, 13 (1956), the indigent defendant was requesting transcripts of his own prior proceeding, not that of a third party. *See Britt*, 404 U.S. at 226. And while the Court rejected a showing of particularized need, it did set forth a requirement that the defendant show some need. *See id.* at 227–28. In determining

whether need has been demonstrated, the relevant factors to consider are: "(1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript." *Id.* at 227. The *Britt* Court noted that in the case of prior proceedings against the defendant himself or herself, "it can ordinarily be assumed that a transcript . . . would be valuable." *Id.* at 228. Thus, the Court looked to prong two and upheld the trial court's denial of transcripts on the basis that Britt had informal means to get at the information revealed by the transcripts. *See id.* at 229–30. The Supreme Court has not extended *Britt*'s presumption of usefulness to transcripts of other people's trials and we decline to do so here. Furthermore, the adoption of a threshold showing of need comports with analogous Wisconsin law; in *State ex rel. Dressler v. Circuit Court*, 163 Wis. 2d 622, 640, 472 N.W.2d 532, 540 (Ct. App. 1991), this court upheld the trial court's decision not to provide funds for witnesses absent a showing of particularized need. In sum, we conclude, as have numerous other jurisdictions, *see, e.g., People v. Brown*, 337 N.W.2d 915 (Mich. Ct. App. 1983), that where an indigent defendant requests that the State furnish him or her with a free transcript of the separate trial of a codefendant, the defendant must show that the transcript will be valuable to him or her.

¶ 35. Oswald did not make a sufficient showing as to how Theodore's transcripts would have been useful to him. The best Oswald can muster is that the transcripts were "extremely relevant." He points to no witness whose testimony at his trial was inconsistent with testimony by the same witness at Theodore's trial.

Oswald's "mere speculation" that the transcripts may have proved valuable is not enough. *See State v. Cox*, 244 A.2d 693, 697 (N.J. Super. Ct. App. Div. 1968).[5]

### d. Discovery of Witnesses' Statements Under § 971.24(1), STATS.

¶ 36. Oswald's final claim regarding the trial court's alleged interference with his right to self-representation is that he should have been supplied with verbatim renditions of witnesses' testimony in Theodore's trial pursuant to § 971.24(1), STATS., 1993–94.[6] That statute read:

> At the trial before a witness other than the defendant testifies, written or phonographically recorded statements of the witness, if any, shall be given to the other party in the absence of the jury. For cause, the court may order the production of such statements prior to trial.

██

¶ 37. The State argues that the statute does not apply to prior trial testimony and that we should decline to address the issue since it was not raised until Oswald's postconviction motion. We resolve the claim on other grounds; assuming, arguendo, that the statute applies, Oswald has failed to show any prejudice because, as discussed above, he has not indicated how the witnesses' statements would have helped his case. *See State v. Lenarchick*, 74 Wis. 2d 425, 452, 247

---

[5] We note that the court in *State v. Cox*, 244 A.2d 693, 697 (N.J. Super. Ct. App. Div. 1968), also distinguished *Beasley v. State*, 404 P.2d 911 (Nev. 1965), one of the few cases upon which Oswald attempts to hang his hat.

[6] The statute has since been amended and renumbered to § 971.23(1)(e), (6m), STATS. *See* 1995 Wis. Act 387, §§ 27–29.

N.W.2d 80, 94 (1976) (finding no prejudicial error even assuming arguendo that the trial court erroneously refused to order production of witness's prior statements).

### 3. *Right to Representation by Retained Counsel of Choice*

¶ 38. Oswald claims that the court infringed his right to counsel by refusing to allow him to substitute attorneys Sosnay and Marquis for Bihler. However, Marquis informed the trial court that absent a continuance he and Sosnay would not take the case. Thus, leave to substitute counsel would have ensured a continuance. Whether to grant such a request is within the discretion of the trial court. *See Phifer v. State*, 64 Wis. 2d 24, 31, 218 N.W.2d 354, 357 (1974). As discussed above, a continuance would have severely inconvenienced the State, the court and all the witnesses. Furthermore, Sosnay and Marquis would have been Oswald's third stab at retaining counsel to his liking. Under those circumstances, the trial court understandably had suspicions that they too would soon be moving to withdraw or would be the subject of a motion to discharge. We uphold the trial court's denial of the request to substitute counsel.

### 4. *Evidentiary Issues*

¶ 39. Oswald claims that certain evidence admitted at trial was seized in violation of the Wisconsin and United States Constitutions and that the admission of this evidence constitutes reversible error. Under this rubric, Oswald objects to the admission of documents seized from his residence, documents seized from his minivan, documents seized from a storage locker, and a

statement Oswald made while under arrest and hospitalized. We first examine the claims about the documents and then turn to the statement.

### a. Documents

¶ 40. Because the modus operandi of the April 1994 bank robbery was similar to that of unsolved robberies of other financial institutions, the police obtained a warrant to search Oswald's residence for evidence linking him to those other crimes. The warrant authorized a search for and seizure of "numerous firearms, handguns and ammunition, . . . clear plastic masks, smoke bombs or incinerary devices, various amounts of United States currency, all of which were used in the commission of or may constitute evidence of the crime of masked armed robbery." Before the police conducted the search, the Milwaukee bomb squad inspected the residence. When the police conducted their search, they leafed through notebooks and other documents that might have contained currency. During this process, words relating to bank robberies, police, guns and armored cars were apparent. The officers thus seized the documents as evidence relating to the bank robberies. The officers also conducted a search of Oswald's minivan pursuant to a separate search warrant. They seized more documents from the minivan. Finally, while searching Oswald's residence, the police saw newspapers on which were highlighted advertisements for commercial storage facilities. Based on this information, the police searched a storage facility Oswald had rented and seized documents there as well. Oswald moved to suppress the seized documents, but the trial court denied his motion.

¶ 41. Oswald claims that the seizure of the documents violated his constitutional right to be free from

130

warrantless searches and seizures. First, he claims that the evidence seized from his residence was not within the scope of the warrant. While the police could briefly peruse documents to see if they contained currency, Oswald claims the officers here went way beyond that by reading the documents more thoroughly and seizing entire boxes of documents. Second, Oswald claims that the plain view exception to the warrant requirement does not apply here because of the bomb squad's initial three-and-one-half hour "sweep" of the premises. According to Oswald, the police cannot claim that documents were in plain view when the officers did not enter the residence until after the bomb squad had moved things around. Oswald claims that the search warrant for the minivan was only obtained because the bomb squad had informed the police that there were incriminating documents in the vehicle. Finally, Oswald claims that documents seized from the storage facility were "fruit of the poisonous tree," as Oswald's connection to the storage locker was based on newspapers improperly seized from his residence and a receipt recovered in the tainted search of his minivan.

¶ 42. Our standard of review on a denial of a motion to suppress is mixed. We uphold the trial court's findings of fact unless clearly erroneous. *See State v. O'Brien*, 223 Wis. 2d 303, 315, 588 N.W.2d 8, 13 (1999). Whether those facts pass constitutional muster is a question of law we review de novo. *See id.*

¶ 43. A person's right to be free from unreasonable searches and seizures is guaranteed by both the Wisconsin and United States Constitutions. *See* U.S. CONST. amend. IV; WIS. CONST. art. I, § 11. Wisconsin courts treat the two provisions as providing the same

scope of protection. *See O'Brien*, 223 Wis. 2d at 316, 588 N.W.2d at 14.

¶ 44. Here, we agree with the State that the warrants authorized the searches. "Generally a premises warrant authorizes the search of all items on the premises so long as those items are plausible receptacles of the objects of the search." *State v. Andrews*, 201 Wis. 2d 383, 389, 549 N.W.2d 210, 212 (1996). Here, currency was listed on the warrant, so the officers were justified in looking through documents where bills could have been hidden. While looking through the documents, the officers noticed "various notes and items relating to bank robberies, . . . escape plans and battle notes." When the incriminating nature of a document is apparent from a brief perusal, such document is justifiably seized under the plain view doctrine. *See United States v. Crouch*, 648 F.2d 932, 933 (4th Cir. 1981) (upholding seizure of letters taken from envelopes during search for chemicals). We need not decide whether the warrant to search the minivan was granted due to the fruits of an illegal search by the bomb squad because the minivan was within the scope of the warrant to search the residence. *See O'Brien*, 223 Wis. 2d at 317–18, 588 N.W.2d at 14 (holding that warrant to search residence encompasses owner's vehicle parked at residence). Finally, because the search of the residence was within the scope of the warrant, the information leading to the warrant to search the storage locker was not tainted.

### b. Statement

¶ 45. Oswald claims that a statement he made to the police while he was hospitalized should not have been admitted because he made it while he was being

held incommunicado. Oswald was injured in the crash that put an end to his standoff with the police. As a result, he was hospitalized after his April 28 arrest. Four days later, police came to his hospital room to collect a hair sample. At that time, Oswald started to ask the officers about his son, the condition of the hostage and the results of the search of his residence. One of the officers told Oswald that if he wanted to discuss the case, the officer would have to read Oswald his constitutional rights. This he did. Oswald then waived those rights and continued to make statements concerning the offenses.

¶ 46. When a confession is the product of "unreasonable police detention for purposes of interrogation," it must be suppressed whether voluntary or not. *State v. Wallace*, 59 Wis. 2d 66, 75–76, 207 N.W.2d 855, 860–61 (1973). A lengthy detention for interrogation is improper if its purpose is to coerce the accused into making "a confession or culpable statements to assure a finding of guilty." *Briggs v. State*, 76 Wis. 2d 313, 325, 251 N.W.2d 12, 17 (1977).

██

¶ 47. Here, Oswald's detention was not even for interrogation, much less prolonged interrogation meant to extract a confession. Oswald was hospitalized because he had injured himself in a police chase after committing armed robbery. Contrary to Oswald's testimony that he was held incommunicado, the officers collecting the hair sample testified that they informed Oswald that an attorney was on his or her way to the hospital and would talk to him if he so desired. While Oswald's testimony was otherwise, we will not overturn the trial court's credibility determinations. *See State v. Wilson*, 179 Wis. 2d 660, 683, 508 N.W.2d 44, 53 (Ct. App. 1993). Finally, Oswald himself called his

hospital guard as a witness at trial. That officer testified that he had offered to pass along Oswald's request for an attorney or to get Oswald a phone book so that he could call an attorney. In sum, the record belies Oswald's claim that he was held incommunicado and his statement was the result of an unreasonable detention for purposes of interrogation.

## 5. Responsibility Plea

¶ 48. Finally, we address Oswald's claim that the trial court erred in denying his motion to reenter a plea of not guilty by reason of mental disease or defect. While represented by his first attorney, Oswald entered an NGI plea. When his second attorney came on the case, he withdrew that plea. Oswald's third attorney proposed that he reenter the insanity plea, but Oswald refused. Then, just three days before his trial was scheduled to begin, Oswald moved to change his plea from not guilty to not guilty by reason of mental disease or defect. The court denied the motion and the accompanying request to order a psychological examination of Oswald. Oswald claims the denial "infringed his rights to trial by jury, to present a defense, to present witnesses, and to choose his plea."

¶ 49. The decision whether to grant a defendant's motion to change his or her plea from "not guilty" to "not guilty by reason of mental disease or defect" is within the discretion of the trial court. *See State v. Kazee*, 192 Wis. 2d 213, 221, 531 N.W.2d 332, 335 (Ct. App. 1995). Thus, we will not disturb that decision as long as it is "consistent with the facts of record and established legal principles." *Id.* at 222, 531 N.W.2d at 336 (quoted source omitted). Furthermore, when a defendant makes an eleventh-hour request to change

his or her plea, he or she has the burden of showing why the plea change is appropriate. *See id.* In other words, the defendant must make an offer of proof encompassing the elements of the defense as set forth in § 971.15, STATS. *See Kazee,* 192 Wis. 2d at 222–23, 531 N.W.2d at 336. In addition, the defendant must show why the nonresponsibility plea was not entered earlier. *See id.* at 223, 531 N.W.2d at 336. Ultimately, when dealing with a request to change a plea at a late stage of the proceedings, the trial court must balance the interests of the defendant with the institutional need to resolve cases in a timely fashion. *See id.* at 222, 531 N.W.2d at 336.

¶ 50. Oswald made neither of the required threshold showings in this case. First, regarding his offer of proof, Oswald points to a report by Dr. Feinsilver, who had conducted a psychological examination of Oswald. Feinsilver opined that Oswald did suffer from clinically recognized mental disorders. But, Feinsilver went on to conclude that Oswald was aware of the wrongfulness of his conduct. Oswald contends that the "substantial capacity" question was for the jury and thus Feinsilver's conclusion was irrelevant. He points out that "[a] favorable expert opinion is not an indispensable prerequisite to a finding of mental disease or defect." But the problem with Oswald's offer of proof is not the lack of an expert opinion; it is the presence of an uncontested expert opinion that goes contrary to the elements of the defense as set forth in the statute. Second, Oswald makes no attempt to explain the timing of his request. Indeed, at the *Machner*[7] hearing,

---

[7] *See State v. Machner,* 101 Wis. 2d 79, 303 N.W.2d 633 (1981). Oswald alleged that Eisenberg's advice to withdraw the nonresponsibility plea constituted ineffective assistance of

Oswald's attorney testified that Oswald had told him that "he didn't for a second think he was insane and that this [plea] was nothing more than a sham and a manipulation on his part." Oswald did not dispute that testimony. Given the insufficiency of Oswald's offer of proof and the timing of his request to change his plea, the trial court's denial of Oswald's request was consistent with the facts of this case and relevant legal principles. We will not disturb the decision.

*By the Court.*—Judgment and order affirmed.

¶ 51. NETTESHIEM, J. *(concurring).* I agree with the majority opinion. I write separately regarding the jury selection issues.

¶ 52. In *State v. Mendoza,* 227 Wis. 2d 838, 596 N.W.2d 736 (1999), the supreme court recently reaffirmed an often-stated principle that trial courts should err on the side of caution when considering a request to remove a prospective juror for cause. The court said:

> [T]he circuit courts are . . . advised to err on the side
> of striking prospective jurors who appear to be
> biased, even if the appellate court would not reverse

counsel. Oswald brings this claim up tangentially on appeal as part of his argument that the court erred in prohibiting him from changing his plea at the last minute. However, the record supports the trial court's finding that the decision to withdraw the plea was Oswald's own decision. Thus, he was not prejudiced by any advice from Eisenberg and we need not address the issue further. *See Strickland v. Washington,* 466 U.S. 668, 697 (1984) (when no prejudice has been shown reviewing court need not address performance prong); *State v. Pettit,* 171 Wis. 2d 627, 647, 492 N.W.2d 633, 642 (Ct. App. 1992) (reviewing court need not address issues inadequately briefed).

their determinations of impartiality. Such action will avoid the appearance of bias, and may save judicial time and resources in the long run.

*Id.* at 864, 596 N.W.2d at 749 (alteration in original; quoting *State v. Ferron*, 219 Wis. 2d 481, 503, 579 N.W.2d 654, 666 (1998)).

¶ 53. At a minimum, the responses of the challenged jurors in this case established an appearance of bias. While that alone is not a basis for reversal, it is hardly a desirable state of affairs. The propriety of a trial court's ruling is not always measured by whether it is affirmed. It would be far better for all concerned—the victims, the State, the judicial institution, the public and Oswald—if it could be said that Oswald was convicted by a jury that reflected no appearance of bias.

¶ 54. More importantly, when the State decided to resist Oswald's challenges for cause and the trial court opted to reject those challenges, no one could confidently say that the appearances of juror bias might not translate into subjective or objective bias in the judgment of a reviewing court. In short, the State and the trial court took an unnecessary risk of reversal. Fortunately for the State and the trial court, that has not come to pass.